Welcome all, Mr. Tussine. We'll hear from you first. Good morning. Welcome. Welcome back. Please proceed. May it please the Court. The trial court here made two reversible errors. First, the trial court erred by finding concurrent jurisdiction under 28 U.S.C. 1581 A and C for the Department of Commerce to correct errors that were made by Customs and Border Protection. The second reversible error is the trial court's conclusion that 19 U.S.C. 1671 A, the countervailing duty investigation statute, mandates the offset that was requested by the plaintiffs in this case, specifically because there are only specific adjustments that may be made to the gross countervailable subsidy during any period of review. Judge Proulx. Just to start at the beginning, maybe I'm misunderstanding, but I understand one of the lead arguments by the government to be that the CIT lacked jurisdiction in this case. Yes, Your Honor. And to be candid, I don't really understand the jurisdiction argument. It seems to me that Commerce made a determination here that it didn't have the statutory authority to grant the offset. CIT, the Court of International Trade, has the statutory authority to review determinations of Commerce. So where's the jurisdictional bar to having the Court of International Trade review Commerce's decision that it didn't have the statutory authority? Again, I'm not clear on why there's a threshold jurisdictional issue here. Well, Your Honor, in our brief, we cited a case called NyChem, which was a decision by this court where exactly the converse is what occurred. The Department of Commerce allegedly made some errors, and then when Customs liquidated the entries subject to the duties, the plaintiff protested before Customs, and then Customs rejected the protest because the plaintiffs had alleged errors by the Department of Commerce. How is that responsive to Judge Proulx's question? Because this court affirmed the dismissal of counts of the complaint that sounded for lack of jurisdiction under 12b-1. The court dismissed those claims for lack of jurisdiction that sounded as claims against the Department of Commerce's decision, even though there was a— Are you saying that the Court of International Trade did not have jurisdiction to review the Commerce's— Commerce made a decision in this case. Their decision happened to be that they lacked the statutory authority to do the offset, correct? That's correct. Are you saying that the Court of International Trade lacks jurisdiction to review such a determination by Commerce? And if so, where's the statutory basis for saying that they don't have jurisdiction over Commerce's decisions? Well, the statutory basis is that the entries, the 1997 entries, were all liquidated, and so they are presumptively liquidated at the correct rate of duty. But what does that have to do with what the trade court was reviewing? It was reviewing a decision of Commerce, which seems to be precisely what 1581c tells it to do. Well, Your Honor, in NYCHM, this court sustained the dismissal of counts of a complaint against customs. This was a well-founded protest against customs that met all the timely deadlines. There was liquidation, and then a protest was made in time. And this court sustained the dismissal of the counts that sounded— I don't care what the court did. C says what it says, and it seems to say, as I think Judge Prost is clearly suggesting, that any time Commerce makes a decision, that that decision is reviewable in the Court of International Trade because the Congress has said so in subsection C. Now, where is that wrong? Your Honor, if the subject matter of the claim against the Department of Commerce is really a claim against customs— but the actual decision contested in front of the trade court was a Commerce decision, saying that the Commerce number was wrong. Now, that may be not true, but I don't see how there's any issue of jurisdiction. Well, Your Honor, we respectfully disagree because by artful pleading alone, a plaintiff cannot create jurisdiction. There's no point in calling it artful pleading. Pleading ought to be artful. What you really mean is that it's legally wrong, but you don't establish that by just giving it a pejorative label like artful pleading. Well, in this case, we believe that our motion to dismiss was properly under Rule 12b-1. However, I believe the court's view is that we could have raised it under 12b-5. Let me ask it this way. If the issue is properly framed as a challenge to Commerce's refusal to set off the amount rather than the customs erroneous liquidation itself— in other words, the issue is Commerce's refusal to set off—doesn't that fall squarely within 1581c? Yes, it does, but there's no—in this case, there's no congressional intent for Commerce to be correcting customs errors and waivers of sovereign immunity. Well, that's a merits issue rather than a jurisdictional issue, isn't it? It can be both, and that's the problem in cases where the government is being sued. There's the distinction between a 12b-6 motion and a 12b-1. All I'm suggesting is that if you frame the issue as it's properly framed as a review of Commerce's refusal to do the setoff because it says it doesn't have statutory power to do so, clearly this court and the CIT had the power to adjudicate whether that was wrong or right. Then you get to the merits, which I invite you to do. And from that point on, regardless of what rule we filed our motion to dismiss under, the analysis remains the same. There—Congress simply never intended—in this case, the exporter and importer were the same party in 1997, Norse Kedro. That's not uncommon, but it's not common either. And Norse Kedro overpaid on its entries for 1997. In 2001, Norse Kedro was once again the exporter and importer of all of its entries, and it sought to offset the rate assessed upon its 2001 entries based upon its alleged overpayments in 1997. Those are just the facts, so let me move on. Can we fairly assume that the government does not want to have it both ways? In other words, is it the government's practice, if indeed the customs had assessed too little, you are agreeing, are you not, that commerce couldn't come in in a subsequent review and recoup that payment, correct? Yes, yes, of course. I just want to be sure there's nothing lurking out there where the government is doing the reverse. Counsel, why does the government feel compelled to call it the alleged overpayment? It looked to me like of all the things disputed here, there was no dispute at all about whether Port Huron charged too much money here. So why are we calling it the alleged overpayment? If it's blatantly clear that there was an overpayment, what's added by saying the alleged? Well, in the beginning of the proceeding, Your Honor, the commerce had never analyzed the record evidence as to whether there was an overpayment, partially because… Yeah, but you're standing here today and you know there was an overpayment. Everybody in this room who's read the brief knows there was an overpayment. If it's that clear, why does the government insist on calling it an alleged overpayment? Okay, Your Honor, we respectfully withdraw the word alleged from our brief and we will concede that there was an overpayment. And the government agrees that they could have protested it to customs, right? There was an avenue of protest in the first instance. We all agree on that? Yes, we agree on that in that there were two… Well, in fact, they could only have protested the deemed liquidation, isn't that right? That's correct. And therefore, if the Federal Circuit goes along with your argument, wouldn't the result be that in every instance in the future it would be prudent always to protest a deemed liquidation? Because then you're covered if indeed when commerce gets around to fixing it, you're on the plus side instead of the negative side. Yes, if the cash deposit rate is higher than the rate that's determined during the administrative review, yes, that's absolutely true. Of course, now you've got, what, 120 or 180 days instead of the old 90 days, so is it a bad thing to have a system that has a built-in incentive for every importer to protest a deemed liquidation? That's correct. And now with the Court's decisions in international trading as well, the date when an entry becomes deemed is clearly fixed and keyed off of the issuance of a Federal Register Notice. So the date when liquidation does become deemed is also known from the outset. Earlier cases where there were non-public— Well, here there's no question that Norse perceived notice of the deemed liquidation. Yes, Norse perceived notice— So they had 90 days within which to protest. Well, Your Honor, we believe that at that point the protest could only have been as to whether the entries were correctly deemed under the deemed liquidation statute. What Norse-Cedro could have done was because they had knowledge of when the entries would have been deemed, and if they didn't receive notice at that time, then they could have protested the fact that the entries were deemed. I thought part of Judge Ellis' question was to ask you whether you really would prefer a system in which there were a great increase in the number of protests to cover them that people would have to take as a precaution under your view of the law. Well, Your Honor, yes, because that's congressional intent in this case. There's no congressional intent that the Department of Commerce correct customs errors, just as there's absolutely no intent as this Court held— Well, is there some indication of congressional intent to the contrary? I mean, after all, it's one government. You know, the party here is the United States. It's not Commerce or Customs or this agency or that agency. The respondent is the United States, one government. Yes, we agree, Your Honor. However, Congress created a very detailed statutory scheme with detailed deadlines— The fact that it's detailed can't by itself show congressional intent that these lines of redress are mutually exclusive. Well, Your Honor, we respectfully disagree. We cited to the legislative history of the 1979 Act in our opening brief where Congress made clear that it was—originally, Customs was responsible for all aspects of calculating countervailing duties and imposition and collection. And in 1979, when Congress gave this responsibility for calculating the rate of duty to the Department of Commerce, it made very clear that it was breaking off and giving a very separate and unique function to Commerce. And then this court in NYCHAM addressed what exactly is—what are the responsibilities of the two agencies. And the court made very clear that Customs could not fix Commerce's errors in response to a protest, even a well—even a well-pled protest before Customs. And the converse should be true because that was— Why? Because Commerce be given a very specific set of rules to follow in calculating countervailing duties. There's no indication, and there's—19 U.S.C. 1677-6 provides an exclusive list of offsets that may be made to the net countervailable subsidy of which correcting other governmental errors is not one. I mean, just like—just like if the plaintiff were to have overpaid on its federal income taxes, it could not receive an offset from Commerce. There's— Here's the problem. I'm happy with your argument. You keep coming back to saying it's clear that Congress intended no redress in a situation like this because they didn't say anything indicated that they wanted redress in a situation like this. That's an argument that silence proves your case. Well, that's not the strongest argument for statutory construction. If Congress had said something clearly that we don't ever want Commerce to correct a Customs error, then you should win. But if they didn't say anything one way or the other, it's not so clear that what their intent was. Well, Your Honor, this—the fact pattern in this case is something that's so rare that Congress probably would never have analyzed this particular pattern because it's such a rare subset of cases. It's only a subset of countervailing duties that involve nonrecurring subsidies. It's only a subset of cases that involve the same exporter and importer over two separate administrative reviews. Look, if this is a one-off case, the question arises, why is the government bothering to appeal? The result here isn't terribly unfair. The party that got overcharged would get—or did get in the court below an equalization of the overcharge. So in a broad equity sense, it's not a terrible result. If you're right in all your reductions of the subpopulation of the subpopulation of the subpopulation of cases, maybe this is a one-off case and the government's wasting our time to appeal it. No, Your Honor, and the court itself never concluded that this was a one-off case and a one-off case. The court made a very broad conclusion that the Department of Commerce was compelled to fix Customs errors. And in doing so, the court misconstrued the countervailing duty law. And we have an obligation to appeal what we view to be erroneous constructions of the statute. Let me just bring you back to one point just for my own clarification. The other side says, as I think in the brief, that Customs doesn't recognize protests to deemed liquidations. Is that—do you agree with that? Do you disagree with that? No, we disagree with that. Okay. What can be done is there's another case called Coyo-Seco that's now before the court, or Coyo, Incorporated. And that case involved deemed liquidations, and the plaintiff protested the notices of the deemed liquidations. We believe that the deemed liquidations are final and conclusive as of the date that they are deemed, but then they may be protested. The deemed liquidation itself may be protested. The notice of the deemed liquidation, if that occurs after the period runs for protesting the deemed liquidation, then an importer may only protest whether the liquidation was correctly deemed. Doesn't CMEX answer this? Is it CMEX, CMEX, a recent case by this court? Yes. CMEX involved—but that was, we believe, that it was dicta in CMEX that— Well, CMEX says, does it not, that deemed liquidation is a decision under 1514a, right? Right. Well, I believe in CMEX the court viewed the notices of liquidation to be the decision. In any event, this party, when they failed to act way back in 2002 or so, no, 2001 I guess it is, wasn't on notice about a subsequent case like CMEX. So don't you have to ask, should they have known that they could and must file a protest at the time that the statute was still running? If anything, they would have known in some later year. It doesn't seem very fair to hold against them. Well, Your Honor, this court in Halpern v. Principia, I believe the case is, concluded that once a court construes a statutory provision, that is the construction of the provision. It goes back to the date that the statute was enacted. So, and parties are presumed to have had actual notice of that construction. And the statute at issue in this case was enacted in 1994. Would it be fair to say that the reason you don't, the government does not consider this a one-off case is the chevron point of the sanctity of the period of review that commerce has, the decision commerce made, in other words, that it has power only during that period of review because you think if it went back, it could introduce all sorts of incentives and open up a can of worms if periods of review could be opened up well into the past. That's correct. That's absolutely correct, Your Honor. And another important point to make for non-recurring subsidies is that it's in the investigation, I believe it was 1991, where commerce determined the actual amount of the subsidy that was conferred, the non-recurring subsidy, and then calculated the allocation period and calculated how much subsidy must be recovered during each period of review. So in essence, what the plaintiffs are asking commerce to do is go back and reopen the investigation. So we're back to where we started, and that is that every importer better file a timely protest to a deemed liquidation if it wants to save it when the actual liquidation, the actual assessment is made by, or imposition, rather. I don't want to mix up imposition and assessment, but you've got to do it early on or you lose it. If customs assesses the wrong amount, yes, you have to protest that immediately. But you don't know at the time that it's wrong if it's deemed. No, Your Honor, you do because you have made a cash deposit already, and when an entry is deemed liquidated, all that means is it's liquidated at the cash deposit rate. Customs already has your money, and all that means is they're not giving it back. But you might get it back if later on commerce decides that the deemed rate was too high. In a subsequent period of review, yes. But liquidation is suspended until the Department of Commerce has completed an administrative review and until court proceedings where there's an injunction issued are all completed. So in the case here where there was no challenge to the 1997 period of review. Well, there couldn't have been. Nothing had happened yet. The liquidation didn't occur for several years later. That seems totally unfair to say, well, they slept on their rights back in 1997 when nothing had happened yet. That's absurd. Nothing happened until 2001. That's the earliest they could have acted. And I guess what you really could say is they were a year late. They should have acted in 2001 immediately upon learning about the liquidation. No, Your Honor, they could have protested those entries back in the entries liquidated in March of 2000, and then the notices of liquidation were posted in late 2000, early 2001. And, yes, at that point, that's when they should have protested and been on top of what was occurring with their entries. But it would have been on a hunch that Commerce was going to come out in their favor. No, because Commerce had already come out on their favor and they had made cash deposits at a higher rate. All right. If they had paid a lower cash deposit rate and Commerce had come out with a higher amount, this is the facts in CMEX, then the importer receives the benefit of the deemed liquidation and the government can't go and try to collect any extra that was paid. And I see I've gone over my time. They won't charge you. Thank you. Thank you, Mr. Tocini. Now, we have an opening argument by Mr. Kellep, is it? Yes, Your Honor. Good morning. Good morning. Five minutes. Three minutes. We represent U.S. Magnesium. It's the domestic industry in the anti-dumping case. I prepared some remarks. What I'd like to do is try and answer some of the questions that you had asked counsel for the government, Judge Ellis. You raised a question about isn't there going to be systematic problems if every importer is required to protest deemed liquidations? Not required, just prudent. It would be prudent for them to do so. And the answer is that it wouldn't be imprudent for them. It would be a prudent idea. In fact, it would be a good idea. And here's why. Because the importers are only going to challenge deemed liquidations when they are adverse to the importers. If the deemed liquidation amount, that is, the amount asserted by the importer at the time of entry is lower than the assessment rate, the importer is going to take advantage of that and not file a deemed protest or deemed liquidation. Secondly, as we found out, I was counsel for CMEX, and we found out there that sometimes a deemed liquidation can hurt the domestic industry, and there's nothing that the domestic industry can do about it. So there's enough unfairness to go around. There's enough unfairness to go around, exactly. But the point here is that, and it's a point that we made in CMEX, and I think that's one still evident to the members on this side of the bar, and that is that the deemed liquidation, in some respects, undermines the machinery of the anti-dumping law. The anti-dumping law and the statutes all say that entries are supposed to be liquidated in accordance with the final and conclusive court decision and the action. Well, all of that work that's done by the agencies, that's done by the parties in the case, gets undermined if six months go by and customs doesn't liquidate. Then the entries are deemed liquidated. So I think it's a good idea in the scheme of things for importers who end up with a higher cash deposit rate than the final assessment rate to file a protest of a deemed liquidation. It makes sense for them, and it preserves the way that the anti-dumping law is supposed to operate and the countervailing duty law as well. And finally, there's no evidence that customs is failing to liquidate entries on time in a broad, systematic, and uncontrolled way. So we're not really looking at a breakdown in the way that the deemed liquidation statute operates. Turn it around. You've told us why it's not such a bad world if it comes out your way. Suppose it comes out the other way and the sanctity of the review period, of the assessment period, is removed. They can go back as far as they want. Do you see any parade of horribles? No, because the deemed liquidation statute is... Did you say yes or no? Pardon me? Did you say yes or no? No, I do not see a parade of horribles. Really? I thought that was a softball. If the way that the dumping law and the countervailing duty law works is you have each series of administrative reviews, and then the final assessment rate is determined and calculated by commerce, and at that point in time the customs assesses the entries against the importer. So the importer looks at the assessment that it gets, its bill, and it says, well, I can either protest this if the entry doesn't get liquidated on time because the entry was deemed, or I can sit tight and just accept the amount that commerce came out of it. Right, but let's suppose that we disagree with the position you've taken and we decide that the period of review isn't sacred, that commerce can go back and do setoffs and do whatever it wishes. Do you see any bad or ill effects from that kind of ruling? Another softball. I think that the... I guess I would have a problem agreeing with the idea that the separate, the administrative reviews are not separate and discrete proceedings. In that case, granted there's an amortization period in the countervailing duty context and administrative review cases involving... So you would agree then that requiring commerce to offset a liquidation error would mingle the functions of imposition in commerce and assessment or liquidation in customs? Would mingle them? I think the answer to that is yes, Your Honor. Hit the softballs. Some of them might be curves. Judge Prost, you mentioned the fact that customs, the question was does customs recognize a protest right for deemed liquidations? I think the answer to that question is yes. The CMEX case certainly stood for the proposition that the posting of a bulletin notice of deemed liquidation triggers a right and an obligation to protest. I know that counsel for NHCI has tried to draw some distinctions there, but the broad reading of the case and the straightforward reading of the case is that it just simply creates a right of protest following the posting of a bulletin notice of deemed liquidation. I'm not sure what the point is. They can clarify if they want. Maybe the point is that customs is automatically going to deny it and therefore the requirement is really that you have to repeal it. You're going to have to repeal it. It's a practical matter. Yes, Your Honor. That's an interesting point. Their point would be, and certainly they can make their argument, is that well, what could we do? Even if we could protest a deemed liquidation, what good is it going to do us because if the statutory requirements for deemed liquidation have been met, then there's nothing that the court or the customs service can do. And the answer to that question is that there's plenty that customs or the court of international trade could do. The court of international trade or customs could decide. We've given you double time. If you have any further points to make very quickly, we'll allow you to make them. Let's finish this response, Your Honor. They could decide as the court in Coyos Court did, which is that the deemed liquidation rule does not operate against importers, and they could also decide, and this is an argument that was available at the time NHCI had an opportunity to protest, they could also decide that the statutes requiring that entries be liquidated in accordance with the administrative determination should trump the deemed liquidation statute because they are more specific statutes, and the specific statutes control over the general. So those are two arguments that could be made in response to a deemed liquidation. Thank you, Your Honor. Thank you. Mr. Emerson? Good morning. We've given both counsel for the other side a great deal of extra time, so you can be advised that you won't be strictly limited to your 15 minutes either. Thank you, Your Honor. That's not an encouragement to use 30. I just mean you don't need to assume that the rest of the time is going to be limited to your 15 minutes either. Thank you, Your Honor. The red light at 15 is going to end your time. I understand. Thank you, Your Honor. Depending on the nature of the questioning, I might want to interpret it that way. Good morning. I would like to go straight to the heart of the issue here in this case, and that is as the Department of Commerce stated in its Issues and Decision Memorandum, the Department stated that it did not have the authority to make the adjustment that was requested by NHCI. In fact, that is incorrect. That is not in accordance with law. The Department of Commerce not only has the authority, but it has the statutory obligation to make the adjustment that NHCI requested at the agency. Let me address one of the Commerce Department's rather key issues here that they've raised before the Court today. Under 1671A, there is an equivalence, a clear equivalence between, on the one hand, the net countervailable subsidy and, on the other hand, the amount of countervailing duties imposed. That's very clear from the statutory structure. On the one hand, the Department of Commerce is talking about particular offsets that are used by the Department of Commerce under 1677-6 to calculate the net countervailable subsidy. Commerce's argument is that the adjustment that NHCI had asked for is not one of those enumerated offsets and, therefore, could not be made. That's correct, isn't it? That is correct. It's not one of the enumerated three. Absolutely right. But, Your Honor, we are not suggesting the Department of Commerce make any adjustments to that side of the calculation. The net countervailable subsidy was established and it is specified in the 14-year amortization schedule, which is part of the joint appendix at JA1095. It was established back in the original investigation back in 1990, I believe it was, 1992 perhaps, and that stays constant over time. That is the net countervailable subsidy, or two of them, nonrecurring subsidies, and they were amortized over time. We have no complaint with the amount of the net countervailable subsidy the Department of Commerce calculated. Where our complaint is, is with the amount of countervailing duties imposed. As we argued to the agency and as we argued to the Court of International Trade, the amount of countervailing duties imposed means the amount of countervailing duties actually assessed against the importer. Well, maybe I'm confused, but doesn't your argument depend on our conflating the two terms assessed and imposed? And I don't see in the statute why you can't fairly read, you know, commerce imposes, customs assesses. Your Honor? And your argument depends, it seems to me, tell me if I'm wrong, that we conflate or intermingle or exchange those two terms. It certainly depends on reading imposed to mean assessed, which is exactly what the Department of Commerce does. As the court, as the CIT below in Serampore discussed, that is a case in which the court upheld the Department of Commerce's interpretation of the term imposed, and this is for purposes of increasing U.S. price in an anti-dumping calculation, but there they upheld the Department of Commerce's decision to interpret imposed to mean assessed. I'll read you from, this is again from Serampore, commerce interprets the word imposed as used in 19 U.S.C. 1677A to include countervailing duties only when they are actually imposed or assessed. That's commerce's interpretation, not just ours. Indeed, and then in the DuPont-Tajian case, which is slightly different, I'll address it if the court would like me to, the court there said, again the trial court, although the department normally interprets the term imposed to require an adjustment to export price only following the actual assessment of countervailing duties following an administrative review. In this case, it dealt with a slightly different situation. But commerce has consistently interpreted imposed to mean assessed. And even in this case, if I could turn the court's attention back to the issues in decision memorandum, the Department of Commerce states, while commerce may not calculate an assessment greater than the actual benefits received by NHCI, in this case, the department calculated the duties commensurate. It's the department, not NHCI, that interprets imposed under 1671, under the countervailing duty statute, to mean assessed. And it's therefore on that side of the calculation where we believe commerce is required to make an adjustment in the 2001 administrative review to recognize the fact that there was an extra payment made in 1997. Because if the Commerce Department doesn't, then at the end of this entire 14-year process, at the end of the, after all of the administrative reviews have taken place, the subsidy amortizes out in 2004, you will have, on the one hand, the net countervailable subsidy, hypothetically a million dollars. And on the other hand, you will have the amount of countervailing duties imposed, a million dollars, plus whatever had been overpaid in 1997. And that is an inequality that the statute, that is contrary to the statute. And don't you think your argument poses a risk in the future for importers because it would have to work in the converse, right, that the government could in years, subsequent years, then recoup amounts? We are not suggesting, there has to be equality. That's absolutely right. And if an importer underpays, the importer has to pay the amount of the net countervailable subsidy, period. Let me move you to another issue and the one we came up with the other side's argument, which is the argument that I thought you made in your briefs, that customs doesn't recognize protests who deem liquidation. They do not. Customs does not. What does that mean, that they do not recognize, that they deny them and therefore everyone always has to appeal because customs never gives it to them? To the left. Is that just a practical? It is our position, based on the cases we've read, both at the time that NHCI might have had the ability to file a protest, which is back actually in early 2000, all the way until today, we do not see any clear precedent from any court to suggest that a deemed liquidation can be protested. In fact, if I could read to the court from our brief, this is a quotation from the Department of Justice's brief to the CIT in the Coyo case that was referred to by counsel for the DOJ, and this is at page 42 of our brief. If the entries were deemed liquidated, as customs decided here, then the protests had to be denied because the deemed liquidation was final and because the no change liquidation resulted in the same rate of duty as the deemed liquidated rate, that is, no change from the deemed liquidated rate. It is my understanding, particularly in the Coyo decision, Coyo case, the litigation that's going on currently that's going to be before the court where briefs have been filed before this court, that the Department of Justice has taken the position that, in fact, deemed liquidations cannot be protested. But forget the Department of Justice. What about this court in CMEX, which said, did it not, that a deemed liquidation is a decision that can be protested? In the CMEX case, and again, I discussed this case with some trepidation because I do know that counsel for one of the defendant appellants was counsel on that case as well. But in that case, I believe that the entries at issue, in fact, were not deemed liquidated. There's a citation here from the CMEX case, if you could give me just a moment. I believe it's 384 Fed 3rd at 1321, where it says, this is the court speaking, while ad hoc agrees with the Court of International Trade that none of the second review entries had been deemed liquidated under 19 U.S.C. 1504D. I don't believe that any of the entries in CMEX, in fact, were subject to the deemed liquidation. And so your point is that even though our court may have said it was dicta? I believe so, Your Honor. I believe so. In fact, if we could go just to the Fujitsu General case, just for a moment, please. And this is from the Court of International Trade. And this, again, goes to one of the points from Chief Judge Mischel about looking at the time that NHCI had the ability, you know, when its entries were deemed liquidated, what could it have done? And actually, Judge Pogue addresses this issue as well in a footnote in the case in his decision. And he says, he talks a little bit about the Fujitsu General case. And he says at footnote 10, and I'll speak about the Fujitsu General case in a minute, he says that this decision, Fujitsu General, had not been issued by the time plaintiff received the notices of liquidation regarding its entries. So it's slightly antedated. However, the groundwork for Fujitsu General America's holding that deemed liquidations were not subject to protest had already been laid by U.S. SHU, which stated that a customs decision involved the application of law to facts, which in fact doesn't happen in a deemed liquidation context. It simply liquidates by operation of law. And in the Fujitsu General case, this is the Court of International Trade speaking, the court says, the Federal Circuit has explained that typically decisions of customs under 1514A are substantive determinations involving the application of pertinent law and precedent to a set of facts, such as a clarification and applicable rate of duty, citing U.S. SHU. Customs does not make a decision in order to affect a deemed liquidation. Rather, a deemed liquidation under 19 U.S.C. 1504D occurs by operation of law. And goes on to say then that an importer's only remedy in that situation is to seek a declaratory judgment under 1581I that a deemed liquidation has in fact occurred, which is utterly useless for an HCI because all we would have gotten, all the company would have gotten from the court is simply a piece of paper that said, yes, by the way, your entries had been liquidated at too much money. Let me ask you this. If you ultimately prevail, tell me exactly what commerce would do in the world as you set forth. Would commerce have to issue one review period duty for everybody else and a different one for this importer? NHCI is the only importer that was involved in the reviews. And I believe that the Department of Commerce, as the court is likely aware, has already issued a remand determination in this case, which I believe is part of the administrative record before the court. And we believe that the department's remand determination is exactly right in this respect. What the Department of Commerce did, again, didn't do anything with the net countervailable subsidy. That stays the same over all those 14 years. But simply for the 2001 period, whereas previously the countervailing duty rate was 1.68 percent, the amount of countervailing duty attributable to this particular period was smaller than the amount of overpayment made to customs back in 1997, so it was zeroed out for 2001. The Department of Commerce issued remand decisions at zero percent for NHCI for 2001. I think that that's exactly right. Then for 2002, 2003, 2004, and the future, to the extent that there is still that overpayment, it would get credited against 2002, 2003, until ultimately there was no overpayment left to adjust the amount of countervailing duty imposed against it. Let me move on to 1520C, kind of another issue here. One of the bases that the Court of International Trade used was that this comes under C for inadvertence and mistake. Correct. Are you pressing that argument here? We certainly understand what the Court of International Trade was saying in trying to craft, if you will, kind of parallel jurisdiction under 1581A and 1581C. However, the notion that the Court of International Trade had any jurisdiction under 1581A depends on the notion that there were, in fact, any of these administrative remedies to pursue with the Customs Service, such as protest and also such as 1520. 1520 simply allows for reliquidation where there has been this inadvertence. But the way the statute is set up under 1504D, the deemed liquidation provision, it can't be the case that a deemed liquidation under 1504D is in inadvertence. It is simply what Congress intended to happen if customs failed to liquidate actively in the six-month time period. If it is in inadvertence, that means that every time a deemed liquidation occurs, it is potentially subject to reliquidation under 1520. Couldn't the rate be inadvertently incorrect? Excuse me? Couldn't the rate of the liquidation be inadvertently incorrect? Well, it would frequently be different from the amount that was calculated by the Department of Commerce. Cash deposit at 10 percent, liquidation instructions at 7 percent that were, for whatever reason, not affected, and then ultimately deemed liquidated at 10 percent, which is the cash deposit rate. In that case... Well, suppose the cash deposit rate were X and they deemed the liquidation at X plus delta X, that would be inadvertent. That, I believe, Your Honor, is a slightly different case, certainly not one here, because that was liquidated at the cash deposit rate. But I believe Your Honor is correct. If in the context of performing the deemed liquidation, if you will, administering the deemed liquidation, putting the liquidation notices out of the customs computer system, if the number happened to be different from the number that was the cash deposit rate, that may be a protestable event because that is, if you will, an error by the customs service. If it should have been liquidated at the cash deposit rate, wasn't liquidated at the cash deposit rate, that may be a protestable event. Let me ask... Please. If commerce is required to take account of entries outside the review period, what, if any, limiting principle is there to how far they can be required to go? This was just a few years ago, but there's no guarantee that it will always be just a couple of years, is there? That's right, Your Honor. But commerce is under a statutory obligation, pardon me, to ensure that the amount of countervailing duties imposed equals the net countervailable subsidy. That's a statutory obligation. And if an importer, foreign producer, such as NHCI, presents the Department of Commerce with data to suggest that there, in fact, was an overpayment at some point in history, that, we submit, is something the Department of Commerce is under an obligation to take into account in determining how to set that assessment rate for a particular administrative review. Would it make the process more... And if you can go back for long periods, doesn't that reduce the incentive for importers to pay attention to what these deemed liquidations are? That figure, shucks, we can deal with this as long as we continue to import. You've always got the situation, I suppose, where if you can go back to many years, some importers quit importing and they sort of get the short end. So it seems to me that what you're suggesting builds in some bad incentives as well. I don't believe so, Your Honor, and let me explain why. First of all, I believe that, at least in the case of most importers, in this particular instance, our company would have much preferred its entries in 1997 be liquidated at the appropriate 2 percent rate, which was the rate at the time, rather than at the 3 to 7 percent rate that they were actually liquidated at. Our client would, in fact, have that money right now rather than going through litigation before the Department of Commerce in trying to get that money back in future reviews. So there's a time value of money that I think will incentivize importers to stay on top of the issue. The other factor, Your Honor, is that it is possible that the overpayments, let's assume that the overpayments occurred toward the end of an amortization period. It's possible that there might not be enough administrative reviews left against which to credit the overpayment, such that even by the end of the amortization period, the Department might say, you know, we've reduced your countervailing duty rate to zero, but we can't give you back the rest of your money. In which case, what would you say would have happened to, as you put it, Congress's mandate that the countervailable and the countervailing duties have to equal? You couldn't do it in that case by your own statement. I think in that extreme case, which is not the one we have here, because, in fact, by the time we get to the end of our amortization period, we will not have run through the full amount that was overcollected. Well, isn't the short answer you should equalize them if possible? I think that's probably the better answer. Softball. You get one, too. I see I'm over my time. Thank you. Thank you, Your Honor. Mr. Ciacchini, three minutes. I just want to address a couple of points made by counsel. First, counsel for U.S. Magnesium, when he was asked about parade of horribles if periods of review are not treated as a discrete event, yes, there will be, because no proceeding could ever really be final. This case, the amortization period was 14 years. If customs had erroneously liquidated back in 1992, we'd be dealing with those issues here in 2006. So there is the prospect of administrative proceedings simply never being final, and that is not Congress's intent, and we cited cases to that effect. Likewise, with respect to the countervailing duty statute, Norris-Kedrow cited to 19 U.S.C. Section 1671A. That is the statute for calculating the amount of a countervailable subsidy during an investigation. That's when Congress determines whether a subsidy was countervailable, whether a benefit was conferred by the foreign government, and how much that was. And that's something we can't lose sight of, the fact that the countervailable subsidy is the amount of the benefit that was conferred by the foreign government. In the end, the foreign government conferred a specific amount, and that benefit was received during the period of review that was challenged. During the 2001 period of review, Norris-Kedrow received a benefit from the Canadian government equal to the allocation that was made during the investigation. And because of that, under the countervailing duty law, that amount needed to be countervailed. That was Congress's mandate. And one more point to make is that the point of countervailing duties here is not only to change the behavior of exporters and producers, but it's to change the behavior of foreign governments, unlike the dumping law. And in a case like this where, although it may occasionally be unfair, under the plaintiff's view, if there was an underpayment in an earlier period of review, then commerce in a later period of review could collect more. That would not necessarily solve the problem because commerce would be overcollecting during the later period of review. Why do you say overcollecting? The net outcome would be collecting exactly the right amount. If they collected too little in the earlier years, and therefore they had to collect correspondingly more in later years, over the total span, commerce will have collected precisely the correct amount that the statute dictates. What's wrong with that as a result? Well, no, Your Honor, because the amount allocated to that particular period of review is going to be wrong. And that, for a nonrecurring subsidy, what you're doing is calculating the benefit that was incurred during that specific period of review, and you're collecting too much. Because Norse Kedro during 2001 did not receive the lesser amount that they're seeking from the Canadian government. They received a higher amount, the amount that was calculated by commerce during the administrative proceeding. I still don't understand why you think it's a bad result if the government is able to correct an error to its detriment by having a higher rate in later years to make up for erroneous undercollection in earlier years. Your Honor, because what you're doing is, well, first, you're not following the statute designed for administrative reviews. The statute that the plaintiffs have cited has been the statute for investigations. There's a comprehensive system for calculating the total countervailable subsidy and allocating that subsidy over subsequent periods. That's conducted during an investigation. And then during administrative reviews, commerce determines the volume of imports and then calculates a rate of subsidy to be applied to imports during that period. That whole system is Congress's intent. Under 1671 and 1671A, B, C, D, E, commerce determines the amount of the countervailable subsidy. And then during subsequent periods of review, commerce follows Section 1675 to calculate the rate of subsidy due during that specific period of review. And those are very separate and discrete proceedings. Well, you say it's so, but that doesn't make it what Congress expected and intended as the operation of the total system. I would have thought that Congress expected the total amount for which importers are being penalized, I'll call it, to be the correct amount and that Congress would not have wanted an incorrect amount to occur in either direction, either to the detriment of the government or to the detriment of the importer. Well, Your Honor, there's a constant tension between accuracy and finality. And in this case, as the Court noted under 520C, customs was given authority to provide a remedy for the errors that were alleged in this case, for the customs errors in this case. Under 520C, Norse-Kedro could have asked for reliquidation due to a clerical error and customs could have decided no, there was no clerical error, or yes, there was a clerical error, and then plaintiffs would have had a right under Section 1581A. Look, if you want to say that the protest procedure is the only available remedy here, and if we agree, the case is over. There's nothing else to talk about. But assume for a moment that maybe Congress didn't want to have the protest procedure the only way to correct a foul-up, however it occurred. Then in that scenario, your answer seems to be, in the annual review periods, we have to wear blinders. We can only look at things within that 12-month period, and the sky will fall if we consider any fact outside the 12-month period. I don't understand that. What is so horrible if you have to consider a clear fact, an undisputed fact, that seems relevant even though it falls outside the 12-month period of review? What is the horror of that? Well, Your Honor, there are other ways of addressing closed proceedings. That just goes back to whether protests should be viewed as Congress's only way to repair a mistake. I agree with you that if that conclusion is reached, all the rest falls apart. But I'm asking you to help me out on the possibility that maybe I won't be persuaded that the protest procedure is the one and only exclusive remedy. And then your answer seems to be, well, even if Congress wanted to allow a remedy, we can't do it because we at Congress don't have any authority to look one day outside the 12-month review period. Why not? That's correct. What Commerce possibly could do would be to reopen an already closed proceeding, but that would be done under a totally different set of standards than are at issue in this case. Administrative agencies are free to reopen closed determinations in general. Wait a minute. If I'm the importer who's a victim of an error and I've paid more than Commerce's calculation of what I should pay, then what's the problem with saying in a later year we'll make an adjustment to get back to what the right dollar amount is? Well, Your Honor, this is no different than, say, the tax law cases that we cited in our brief. Don't talk to me about tax law. Talk to me about what Commerce can do and should do to make this system work sensibly so people don't pay too little but they also don't pay too much. Well, Your Honor, it's incumbent upon the importers, we believe, to monitor their own entries and That's just the same argument all over again that protest is the only evidence. If you're right, you win. But what if you're not right? Then why is it forbidden for Commerce to take a commonsensical approach and correct for the error in some future years? Because the statute doesn't provide for any such relief and the statute provides a very detailed road map for the agency to follow in calculating and countervailing. Well, are you afraid if Commerce has a little more power than it's comfortable having? What's wrong with that? And then, Your Honor, to fill in the gaps under Chevron, so long as Commerce's determination is reasonable, then it must be sustained by the court even if the court were to view an alternative methodology as being favorable. So long as there's a reasonable basis for the agency determination under Chevron, it must be sustained. The question is, why is it so terrible for Commerce to have a little more power than it's in the past assumed that it had? Your Honor, that's a choice that's made by Congress. And the agency construes the statute as providing very detailed means for calculating a number of things. Occasionally, there are gaps that the agency fills. However, in this case, Commerce viewed the statute as a whole and concluded that Congress did not provide a means for Commerce to correct Customs' errors, and that should be sustained pursuant to the Chevron analysis. All right, thank you. We'll take the case under advisement. We thank all three counselors.